## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**MESA INDUSTRIES, INC.,**

      **Plaintiff,**

      **v.**

**CHARTER INDUSTRIAL
SUPPLY, INC., et al.**

      **Defendants.**

**Case No. 1:22-cv-160
JUDGE DOUGLAS R. COLE**

### OPINION AND ORDER

This matter comes before the Court on Plaintiff Mesa Industries, Inc.'s Verified Complaint (Doc. 1) and Motion for a Temporary Restraining Order and/or Preliminary Injunction (Doc. 2). For the reasons below, the Court **GRANTS** Mesa's Motion for a Temporary Restraining Order (Doc. 2) pending completion of a Preliminary Injunction Hearing and as further detailed below.

### BACKGROUND

This action arises out of Mesa Industries, Inc.'s ("Mesa") allegations of trade secret misappropriation, breach of contract, and other misdeeds by its former employees, Defendants Alejandro Espinoza and Kyle King, and the individual Defendants' new employer, Defendant Charter Industrial Supply, Inc. ("Charter").

According to the Verified Complaint, Espinoza began working for Mesa at Mesa's California location as a "Quality Control/Design Drafter" in 2012. (Compl., Doc. 1, #6). In that position, he maintained and updated drawings for manufactured equipment and managed quality control standards. (*Id.*). Espinoza transferred to

Mesa's Cincinnati location in 2016 and continued working there until his resignation in January 2020. (*Id.* at #9). Defendant Kyle King worked for Mesa in Cincinnati from 2016 to 2018. (*Id.* at #10).

In 2012, at the outset of his employment, Espinoza signed a Non-Compete and Non-Disclosure Agreement ("NC/ND"). (*Id.* at #6). Pursuant to that agreement, Espinoza agreed:

> not to give, divulge, offer or promise (directly or indirectly) to any other company, organization or institution anything of value to Mesa which includes, Trade Secrets and Propriety Information such as formulas, processes, materials specifications and designs (current and prototype), pricing information, customer lists, supplier/sub-contractor vendor list, business plans or any other information that is not readily available from published articles and brochures.

(*Id.* at #6–7).

Both Espinoza and King also executed "Employee Handbook Acknowledgment forms," by which they acknowledged the Non-Disclosure Policy included in Mesa's Employee Handbook. (*Id.* at #7, 10). That policy states, in pertinent part:

> During the term of employment with Mesa Industries, employees may have access to and become familiar with information of a confidential, proprietary, or secret nature, which is or may be either applicable or related to the present or future business of Mesa Industries, its research and development, or the business of its customers. For example, trade secret information includes, but is not limited to, devices, inventions, processes and compilations of information, records, specifications, and information concerning customers or vendors. Employees shall not disclose any of the above-mentioned trade secrets, directly or indirectly, or use them in any way, *either during the term of their employment or at any time thereafter*, except as required in the course of employment with Mesa Industries.

(*Id.* at #7 (emphasis added)).

Separately, Espinoza also signed in 2013 a Nondisclosure Agreement ("NDA") with an Ohio choice of law provision. (*Id.* at #7, 9). In doing so, Espinoza agreed to protect Mesa's "Confidential Information" from "disclosure to any person other than to persons having a need for disclosure in connection with [Espinoza's] authorized use of the Confidential Information with [Mesa's] prior written authorization," as well as to take reasonably necessary steps to protect the secrecy of the Confidential Information and to prevent it from becoming public or falling into the hands of "unauthorized persons." (*Id.* at #8).

That NDA further defined "Confidential Information" broadly to include, among other things, information about Mesa's customers and potential customers, as well as Mesa's:

> trade secrets, technologies, engineering or operation methods or techniques, research data, formulas, test results, samples of materials and results of any analysis of such samples, marketing plans, service plans, patent applications, patents pending, names of customers or potential customers, customer files, vendor lists, vendor files, [and] contracts ….

(*Id.* at #7–8). Indeed, that agreement provided that "*all information* disclosed by Company to Promisor during the term of his/her employment shall be deemed the confidential and proprietary information of Company, irrespective of the source or true ownership of such information." (*Id.* at #8 (emphasis added)). In paragraph 6 of the NDA, Espinoza agreed to return or destroy any of Mesa's Confidential Information within 15 days of his termination. (*Id.* at #8–9).

Mesa alleges that these measures were necessary because, in the course of his employment, Espinoza accessed and used various materials that Mesa now contends

3

are trade secrets. (*See id.* at #9, 10 (noting that Espinoza and King were "provided access to valuable confidential … information, including … the AST Database, [and] Application Drawings")). As pertinent to this Opinion, the confidential information Mesa identifies as "trade secrets" falls into two categories. First, Mesa maintains an Above-Ground Storage Tank Database ("AST Database") which has "detailed information about its customers' tanks, their components, technical specifications, service history, pricing and other information." (*Id.* at #5). The AST Database is a compilation of thirty years of data, which Mesa says is not publicly available and could not be replicated without substantial time and effort. (*Id.*). Second, Mesa maintains "Application Drawings" regarding each tank in the AST Database. (*Id.*). Application Drawings "provide additional critical information regarding the use of specific products in specific tanks and allow for efficient servicing of tanks without the need to re-engineer products." (*Id.* at #5). This gives Mesa a competitive advantage because having advance knowledge of a tank's specifications and past service allows it to anticipate customers' needs, prepare parts and components in advance, and eliminate or minimize engineering issues. (*Id.* at #6).

Mesa says it relies upon its AST Database and Application Drawings, among other confidential information, to compete for business. It also says it has taken measures to maintain the confidentiality of this information, including by way of the ND/NC and NDA agreements outlined above. In addition, the Database and Drawings "are not publicly available and are maintained by [Mesa] in confidentiality,

with limited access granted only to employees who have a job related need to access the AST Database and/or Application Drawings." (*Id.* at #5).

In 2020, Mesa learned that Espinoza, despite telling Mesa he was accepting another position in Cincinnati, had gone to work with Defendant Charter in California. (*See id.* at #9). Mesa sent a letter to Espinoza, copying Charter, reminding Espinoza of his legal obligations regarding Mesa's confidential information and trade secrets. (*Id.*). Espinoza responded that he had not "used and [would] not use any of Mesa's confidential or trade secret information in any manner including in [his] employment with Charter." (*Id.* at #10).

According to Mesa, however, that assurance was false, and Espinoza was, in fact, using Mesa's confidential information. (*Id.*). In January 2022, William Dominguez, another former Mesa employee who later went to work for Charter (but is not a party to this action), contacted Mesa about potential use of Mesa's trade secrets by Defendants. (*Id.* at #12). According to Dominguez, Espinoza has a copy of Mesa's AST Database and Application Drawings on a USB thumb drive that he shares with King and Charter. (*Id.*). Dominguez also sent screenshots of texts between Espinoza, King, and others at Charter in which they make reference to specific tanks owned by Mesa customers and identify ASTs by the numbers that Mesa assigned to those ASTs in Mesa's AST Database. (*Id.*; *see also* Text Message Screenshots, Compl. Ex. C, Doc. 1-3). The messages allegedly include pictures of Mesa Application Drawings and other materials, such as Mesa's chemical compatibility chart. (Compl., Doc. 1, #12–13).

5

Mesa filed a verified, eight-count Complaint (Doc. 1) on March 29, 2022. In that Complaint, Mesa asserts claims for: breach of contract and breach of the duty of loyalty against Espinoza, tortious interference with contract against Charter, and trade secret misappropriation under both federal and Ohio law against all Defendants. The same day, Mesa filed a Motion for a Temporary Restraining Order and/or Preliminary Injunction (Doc. 2). That Motion is now before the Court.

## LAW AND ANALYSIS

Mesa seeks a temporary restraining order preventing any of the Defendants from "accessing, disclosing, and/or using" materials obtained by Espinoza from Mesa, including Mesa's Application Drawings, Above-Ground Storage Tank Database, and any printouts or copies of either, in whatever media they may be stored. Before determining whether Mesa is entitled to such relief, however, the Court must first address a preliminary issue. Specifically, Defendants have raised concerns about whether the Court has personal jurisdiction over them. Thus, the Court starts with that question, before turning to the merits of Mesa's request.

**A.    The Court Concludes That Personal Jurisdiction Exists For Purposes Of Considering A TRO, But Does So Without Prejudice To Defendants' Ability To Re-Raise That Issue.**

A court must have personal jurisdiction over the parties before it entertains the merits or quasi-merits of a case, and that includes issuance of a temporary restraining order. *RPB SA v. Hyla, Inc.*, No. LA CV20-04105 JAK (SKx), 2020 WL 12187801, at *4 (C.D. Cal. June 9, 2020) (citing *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999)). Although Defendants have not yet formally objected to personal

6

jurisdiction, they raised concerns along those lines during telephonic conferences to discuss the pending Motion (Doc. 2), and they have represented to the Court that they intend to file a motion challenging both personal jurisdiction and venue. Notwithstanding those concerns, however, the Court concludes that it may exercise personal jurisdiction for purposes of entering the instant temporary restraining order.

A court may determine the issue of jurisdiction on the basis of pleadings and affidavits alone. *Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 505 (6th Cir. 2020) (quoting *Serras v. First Tenn. Bank Nat. Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989)). If it does so, a plaintiff need only make a prima facie showing of personal jurisdiction. *Id.* (quoting *Schneider v. Hardesty*, 669 F.3d 693, 697 (6th Cir. 2012)). Moreover, in evaluating whether the plaintiff has met this "relatively slight" burden, the court "must consider the pleadings and affidavits in the light most favorable to the plaintiff." *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1169 (6th Cir. 1988) (quoting *Welsh v. Gibbs*, 631 F.2d 436, 439 (6th Cir. 1980)).

Where, as here, the Court's subject-matter jurisdiction is based on a federal question, the exercise of personal jurisdiction over a defendant is proper if it is "both authorized by the forum State's long-arm statute and in accordance with the Due Process Clause of the Fourteenth Amendment."[1] *AlixPartners, LLP v. Brewington*,

---

[1] Ohio's legislature recently amended the State's long-arm statute, and there is now some question whether a court must separately analyze the jurisdictional exercise under both the long-arm statute *and* the Due Process Clause, or whether these inquiries have merged. *Compare C.T. v. Red Roof Inns, Inc.*, No. 2:19-CV-5384, 2021 WL 2942483, at *10 (S.D. Ohio July 1, 2021) ("Thus, even if the TVPRA does not confer nationwide service of process, this Court could still exercise jurisdiction over a suit if it comported with Ohio's long-arm statute

836 F.3d 543, 549 (6th Cir. 2016) (citing *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002), in turn quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 954 F.2d 1174, 1176 (6th Cir. 1992)). Ohio's long-arm statute confers personal jurisdiction over, among others, anyone "[c]ausing tortious injury in [Ohio] to any person by an act outside [Ohio] committed with the purpose of injuring persons, when the person might reasonably have expected that some person would be injured thereby in [Ohio]." Ohio Rev. Code § 2307.382(A)(6). The Due Process inquiry, meanwhile, asks "whether … the non-resident defendant possesses such minimum contacts with the forum state that the exercise of jurisdiction would comport with traditional notions of fair play and substantial justice." *Beydoun v. Wataniya Rests. Holding, Q.S.C.*, 768 F.3d 499, 505 (6th Cir. 2014) (quoting *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991) (internal quotation marks omitted)).

Based on the limited materials before the Court at this juncture—that is, Mesa's Verified Complaint (Doc. 1)—the Court concludes, at least preliminarily, that the exercise of personal jurisdiction over the Defendants is proper in this case. Mesa alleges that the individual Defendants, Espinoza and King, worked for Mesa at its Cincinnati, Ohio, location for a number of years, and that Ohio is where Espinoza misappropriated the allegedly confidential materials now at issue. Mesa also alleges

---

and the U.S. Constitution, which are now coextensive."), *with Premier Prop. Sales Ltd. v. Gospel Ministries Int'l, Inc.*, 539 F. Supp. 3d 822, 828 n.2 (S.D. Ohio 2021). ("This interpretation does not, however, collapse the long-arm statute's specific jurisdiction test into the Federal standard. Plaintiffs … asserting that a court has specific jurisdiction over a defendant must still demonstrate their claim arose from one of the enumerated factors."). The Court does not address that question here, however, because it concludes that jurisdiction is proper under both Ohio's long-arm statute and the Due Process clause separately; thus, the same result would obtain either way.

that Espinoza, King, and Charter have all used that information to their competitive benefit—and to the competitive detriment of Mesa, which is allegedly headquartered in Ohio—despite knowledge of its confidential nature. In the absence of any conflicting accounts of the salient facts, the Court concludes that this connection suffices both under Ohio's long-arm statute and the Due Process Clause. The Court specifically notes, though, that its conclusion is preliminary, and in no way prejudices Defendants' ability to formally raise this issue in the future on a more fully developed factual record.

## B. Mesa Has Established That It Is Entitled To A Temporary Restraining Order.

Turning to the merits of the Motion for TRO, "[a] temporary restraining order is an extraordinary remedy that should only be granted if the movant can clearly show the need for one." *Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp. 2d 853, 860 (S.D. Ohio 2008) (citing *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 650 (6th Cir. 1993)). Ultimately, "the purpose of a TRO under Rule 65 is to preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 226 (6th Cir. 1996)).

Mesa bears the burden of establishing entitlement to a temporary restraining order. *See Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009) (citations omitted). To satisfy this burden, Mesa must establish its case by clear and convincing evidence. *Hartman v. Acton*, No. 2:20-cv-1952, 2020 WL 1932896, at *2 (S.D. Ohio Apr. 21, 2020) (quoting *Marshall v. Ohio Univ.*, No. 2:15-CV-775, 2015 WL 1179955, at *4

9

(S.D. Ohio Mar. 13, 2015), in turn citing *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)).

The question of whether a movant is entitled to this extraordinary relief is guided by the same four factors as are considered for a preliminary injunction: (1) whether plaintiff has a substantial likelihood or probability of success on the merits; (2) whether plaintiff will suffer irreparable injury if the relief is not granted; (3) whether the injunctive relief would unjustifiably harm a third party; and (4) whether the public interest would be served by issuing the injunctive relief. *Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985); *Am. Family Life Ins. Co. v. Hagan*, 266 F. Supp. 2d 682, 687 (N.D. Ohio 2002). This test is a flexible one—the factors are not prerequisites to be met, but considerations that must be balanced against each other. *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000) (citing cases); *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

### 1. Mesa Has Established A Substantial Likelihood Of Success On Its Trade Secret Misappropriation Claims.

First, the Court concludes that Mesa has established a substantial likelihood of success on the merits, at least as to its trade secret claims. With respect to its Ohio Uniform Trade Secrets Act ("OUTSA") claim, Mesa "must prove: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Coda Dev. s.r.o. v. Goodyear Tire & Rubber Co.*, No. 5:15-CV-1572, 2021 WL 4477913, at *8 (N.D. Ohio Sept. 30, 2021) (quoting *Advance Wire Forming, Inc. v. Stein*, No. 1:18-cv-723, 2020 WL 5026523, at *19 (N.D. Ohio Aug. 25, 2020)).

10

OUTSA defines "trade secret" as "information" that both (1) "derives independent economic value" from not being generally known to or readily ascertainable by competitors, and (2) is the subject of efforts to maintain its secrecy that are "reasonable under the circumstances." Ohio Rev. Code § 1333.61(D). The Ohio Supreme Court has articulated six factors, none of which is dispositive, for determining whether information constitutes a trade secret under OUTSA:

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 687 N.E.2d 661, 672 (Ohio 1997) (citing, e.g., *Pyromatics, Inc. v. Petruziello*, 454 N.E.2d 588, 592 (Ohio Ct. App. 1983)); *Hance v. Cleveland Clinic*, 172 N.E.3d 478, 486 (Ohio Ct. App. 2021) ("No single factor is dispositive.") (citation omitted).

Here, Mesa advances two potential "trade secrets." First, Mesa offers its AST Database, which is a thirty-year working compilation of "detailed information about its customers' tanks, their components, technical specifications, service history, pricing and other information" that Mesa says is not otherwise available and would be very difficult to replicate. Second, Mesa points to its "Application Drawings," which it maintains for each tank in the AST Database. Application Drawings "provide additional critical information regarding the use of specific products in specific tanks and allow for efficient servicing of tanks without the need to re-engineer products,"

which give a competitive advantage because having advance knowledge of a tank's specifications and past service allows Mesa to anticipate customers' needs, prepare parts and components in advance, and eliminate or minimize engineering issues.

The Court concludes, crediting the verified allegations, that Mesa is likely to prove that this information constituted "trade secrets" as defined by OUTSA. The AST Database and Application Drawings "are not publicly available and are maintained by [Mesa] in confidentiality, with limited access granted only to employees who have a job related need to access" them. (Compl., Doc. 1, #5). Mesa also alleges that it has taken significant time and effort to compile this information, and that the information allows Mesa to diagnose and resolve customer needs more quickly and accurately. Although the existence of a trade secret is generally a question of fact, *Wellington Res. Grp. LLC v. Beck Energy Corp.*, No. 2:12-CV-104, 2013 WL 5325911, at *5 (S.D. Ohio Sept. 20, 2013), Mesa has at least shown a substantial likelihood that the AST Database and Application Drawings qualify.

Mesa is also substantially likely to succeed in showing that Espinoza gained the information at issue by virtue of a confidential relationship. Where an express agreement bars disclosure of trade secrets, the defendant acquires trade secrets through a confidential relationship. *See MEMC Elec. Materials v. Balakrishnan*, No. 2:12-CV-344, 2012 WL 3962905, at *7 (S.D. Ohio Sept. 11, 2012). In this regard, Mesa alleges that Espinoza gained access to and copies of the AST Database and Application Drawings while he was working for Mesa. During that time, Mesa alleges Espinoza signed multiple agreements that referenced "trade secrets," "proprietary

12

information," and "confidential information." The AST Database and Application Drawings at least arguably fall under the definition of "Confidential Information" in Espinoza's NDA, which includes, among other things, Mesa's "technologies, engineering or operation methods or techniques, research data, [and] formulas." These agreements made clear Espinoza's obligations not to disclose Mesa's confidential information, and yet Mesa alleges Espinoza took with him when he left a USB drive containing the AST Database and Application Drawings. Likewise, Both Espinoza and King acknowledged the Non-Disclosure Policy in the Mesa Employee Handbook. That is enough, at least for present purposes.

Finally, assuming the verified allegations are true, Mesa is likely to prove the unauthorized use of a trade secret. Under the OUSTA, "misappropriation" includes:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; [or]

(2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:

(a) Used improper means to acquire knowledge of the trade secret;

(b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

(c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Ohio Rev. Code § 1333.61(B). "Improper means" include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* § 1333.61(A); *see also Kendall Holdings, Ltd. v. PHPK Techs.*, 521 F. App'x 453, 456–57 (6th Cir. 2013).

Here, Mesa attached to its Verified Complaint reproductions of text messages among and between current and former Charter employees, including Espinoza and King, that appear to refer to above-ground storage tanks owned by Mesa customers and to identify those tanks by the numbers assigned in Mesa's AST Database. (*See generally* Text Message Screenshots, Compl. Ex. C, Doc. 1-3, #31–43). The texts also appear to include screenshots of Mesa's Applications Drawings, as well as references to Mesa's chemical compatibility chart. (*Id.*). There is, ostensibly, "use."

As for the "unauthorized" part, Mesa alleges that Espinoza and King, at the time of their disclosure of Mesa's alleged trade secrets, knew that they had acquired the information "under circumstances giving rise to a duty to maintain its secrecy or limit its use"—i.e., their acknowledgment of the Non-Disclosure Policy in the Mesa Employee Handbook. *See* Ohio Rev. Code § 1333.61(B)(2)(b). And Charter, in receiving the alleged trade secrets, knew or had reason to know that the information was disclosed in breach of at least Espinoza's obligation to secrecy, because Mesa alleges it sent a letter detailing those obligations to Charter and Espinoza in 2020. (Compl., Doc. 1, #9).

In sum, Mesa has established a likelihood—though not a certainty—of success with respect to its OUTSA claim. And, because "the requirements for establishing

misappropriation of trade secrets are largely the same under Ohio and federal law," *Aday v. Westfield Ins. Co.*, 486 F. Supp. 3d 1153, 1160 (S.D. Ohio 2020), aff'd in part, rev'd in part on other grounds, No. 21-3115, 2022 WL 203327 (6th Cir. Jan. 24, 2022), the Court applies this conclusion to Mesa's federal Defend Trade Secrets Act claims, as well. *See also PUI Audio, Inc. v. Van Den Broek*, No. 3:21-CV-284, 2021 WL 4905461, at *5 n.5 (S.D. Ohio Oct. 21, 2021) (noting the "definition of 'trade secret' and 'misappropriation' in the OUTSA and the DTSA are similar" and comparing Ohio Rev. Code §§ 1333.61(B) and (D) with 18 U.S.C. §§ 1839(3) and (5)).

Because the Court concludes that Mesa has established a likelihood of success on its trade secret misappropriation claims, and because the requested TRO is directed to enjoining the continuing use of those alleged trade secrets, the Court need not, and does not, decide the likelihood of success with respect to Mesa's other claims: breach of contract and breach of the duty of loyalty against Espinoza, and tortious interference with contract against Charter.

### 2. Mesa Has Established That It Will Suffer Irreparable Harm In The Absence Of Temporary Injunctive Relief.

The irreparable harm factor also weighs in favor of Mesa, if ony marginally. Harm is irreparable if it cannot be fully compensated by monetary damages. *Overstreet*, 305 F.3d at 578. Here, as explained above, Mesa has established a likelihood that Charter, Espinoza, and King are engaging in the unauthorized use of Mesa's trade secrets. This amounts to a kind of unfair competition for customers, and the Sixth Circuit has held that the loss of "fair competition" can irreparably harm a business. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) (citation

15

omitted). Although *Basicomputer* considered "unfair competition" in the context of an employee's breach of his non-compete agreement, the same notion may be applied to unfair competition in the non-disclosure context. Indeed, it is directed at the very same fear: that a former employee will use information gleaned from his former employer to interfere with that employer's customer relationships. *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007). That is, the improper use of this confidential information could undercut a competitive edge that Mesa had developed in the marketplace. This is the kind of harm the Sixth Circuit has considered "difficult to calculate." *See id.*

At the same time, during the conferences the Court held on the TRO, Mesa was unable to establish any specific upcoming harms likely to result from the alleged ongoing use here. For example, it did not point to any particular projects as to which the two entities were currently competing. Nor is this a cyclical business where the time period between now and when the Court could schedule a hearing on the Motion is of particular importance.

As such, this factor weighs in favor of granting temporary injunctive relief, but only slightly.

### 3. Neither The Harm To Third Parties Nor Service Of The Public Interest Weighs Strongly Against Granting Temporary Injunctive Relief.

Neither of the third or fourth prongs of the TRO inquiry weigh heavily in either direction. "The third and fourth prongs of the [temporary restraining order] analysis" require "assessing the harm to the opposing party and weighing the public interest."

*Kohler v. City of Cincinnati*, No. 1:20-CV-889, 2021 WL 761630, at *13 (S.D. Ohio Feb. 27, 2021), *report and recommendation adopted*, No. 1:20-CV-889, 2021 WL 1558334 (S.D. Ohio Apr. 21, 2021).

Although Charter may suffer some harm should a temporary restraining order be improvidently granted, the Court notes that the very narrow construction of the TRO the Court is issuing (more on that below) significantly mitigates that harm, in that it specifically restrains Charter only from accessing Mesa's Application Drawings and AST Database, while disclaiming any restraint on the use of information included in those materials that is available from outside sources. As to the fourth prong, the public interest, Mesa suggests that a TRO in this case would serve the public because the public has an interest in "fair competition in business." (TRO/PI Mot., Doc. 2, #58 (citing *ALTA Analytics, Inc. v. Muuss*, 75 F. Supp. 2d 773, 786 (S.D. Ohio 1999)). Although such an interest is only vaguely stated, the Court agrees that Ohio's trade secret law embodies a public policy in favor of "maintain[ing] the standards of commercial ethics and the encouragement of invention, as well as the protection of the substantial investment of employers in their proprietary information." *ALTA Analytics*, 75 F. Supp. 2d at 786 (quotation omitted).

In sum, while the latter three factors of the temporary restraining order inquiry do not weigh overwhelmingly in favor of granting such an order, neither do they detract from Mesa's established likelihood of success on its trade secret claims. As such, the Court considers Mesa to have carried its burden, and therefore **GRANTS**

17

Mesa's Motion for a Temporary Restraining Order and/or Preliminary Injunction (Doc. 2) as detailed below.

**C.    The Court's Order Will Be Narrowly Circumscribed And Sufficiently Specific To Afford Defendants Notice Of What Is And Is Not Permitted.**

Finally, when a court decides to fashion a TRO, the court must ensure that the TRO is neither "impermissibly vague," nor "overly broad." *Union Home Mortg. Corp. v. Cromer*, No. 21-3492, 2022 WL 1022050, at *4 (6th Cir. April 6, 2022). "To that end, an injunction must be couched in specific and unambiguous terms, such that 'an ordinary person reading the court's order [is] able to ascertain from the document itself exactly what conduct is proscribed.'" *Id.* (quoting *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016)) (additional citations omitted). In fashioning the Order here, the Court has endeavored to be mindful of that requirement.

## CONCLUSION

Accordingly, for the foregoing reasons, the Court hereby **ORDERS** as follows:

1. Defendants and their agents shall be restrained and enjoined from accessing, disclosing, and/or using the following:

    a.  Plaintiff's Application Drawings (defined immediately below) obtained from Plaintiff by Defendant Espinoza;

        i.  Plaintiff's Application Drawings are a set of drawings created by Plaintiff in either AutoCAD or Autodesk Inventor depicting Plaintiff's products in individual files (one per drawing), with each drawing saved in its own file in various formats, including

PDF (.pdf), AutoCAD (.dwg) and Autodesk Inventor (.ipt, .iam, .idw); and

b.  Plaintiff's Above-Ground Storage Tank Database (defined immediately below) obtained from Plaintiff by Defendant Espinoza;

   i.  Plaintiff's Above-Ground Storage Tank Database is a set of data regarding above ground storage tanks compiled by Plaintiff into a single database in MS Access stored in a single MS Access file (.mdb); and

c.  Any printouts or copies, whether electronic or otherwise, of Plaintiff's Application Drawings and Above-Ground Storage Tank Database obtained from Plaintiff by Defendant Espinoza and stored on any media.

2.  Nothing in this Order prevents Defendants from accessing, disclosing, and/or using information that happens to be included in Plaintiff's Application Drawings and Above-Ground Storage Tank Database, provided that the Defendants obtain that information from sources other than copies of Plaintiff's Application Drawings and Above-Ground Storage Tank Database. Furthermore, it is not a violation of this Order for the Defendants to use Plaintiff's Application Drawings if the Defendants obtained those drawings from customers in hard copy or PDF format.

3.  Based on the facts of this case, the Court hereby exercises its discretion to waive the posting of any security pursuant to Fed. R. Civ. P. 65(c). In particular, given the narrow scope of the relief that the Court is providing, the

Court concludes that Defendants are unlikely to suffer any compensable harm as a result of this Order.

4. Although Fed. R. Civ. P. 65(b)(2) provides that a TRO will expire no later than 14 days after entry, it also provides that such an expiration may be extended if the "adverse party consents to a longer extension." The Court raised the issue of expiration at a telephonic conference on the instant Motion. While Defendants did object to the entry of a TRO, when asked about expiration they did not object to the TRO remaining in effect until the Court enters an Order on Plaintiff's motion for preliminary injunction. Thus, this Temporary Restraining Order is effective immediately and shall remain in effect until the Court enters an Order on Plaintiff's motion for a preliminary injunction following the conclusion of the preliminary injunction hearing, which is currently scheduled for May 17–18, 2022. That said, Defendants did not have an occasion to consider the expiration issue in depth. Thus, the Court's determination regarding the duration of the TRO is without prejudice to Defendants' ability to re-raise that issue should they elect to do so.

5. Similarly, as the Court already told the parties, nothing in this Order precludes Defendants from challenging the Court's personal jurisdiction over any Defendants, nor does it preclude Defendants from challenging venue. Any such challenge(s) shall be filed and briefed on the following schedule:

    a. Defendants' Motion(s) and Memoranda in Support  April 13, 2022

    b. Plaintiff's Response(s)  April 20, 2022

c. Defendants' Replies                           April 25, 2022

**SO ORDERED.**

April 7, 2022
_____
**DATE**                          **DOUGLAS R. COLE**
                                    **UNITED STATES DISTRICT JUDGE**