## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**MESA INDUSTRIES, INC.,**

        **Plaintiff,**

                                    **Case No. 1:22-cv-160**

      **v.**                             **JUDGE DOUGLAS R. COLE**

**CHARTER INDUSTRIAL**
**SUPPLY, INC., et al.**

        **Defendants.**

## OPINION AND ORDER

This matter comes before the Court on Defendants Charter Industrial Supply, Inc., Alejandro Espinoza, and Kyle King's Motion to Dismiss or, in the Alternative, Transfer Venue (Doc. 16). For the reasons stated more fully below, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion (Doc. 16). Specifically, the Court **DENIES** Defendants' Motion to Dismiss for lack of personal jurisdiction, as well as Defendants' alternative request to transfer the action to the Central District of California. The Court **GRANTS** Defendants' Motion to the extent that it **DISMISSES** Counts Three and Four of Mesa's Complaint (Doc. 1) for failure to state a claim.

## BACKGROUND

This action arises out of Plaintiff Mesa Industries, Inc.'s ("Mesa") allegations of trade secret misappropriation, breach of contract, and other misdeeds by its former employees, Defendants Alejandro Espinoza and Kyle King (the "individual

Defendants"), and the individual Defendants' new employer, Defendant Charter Industrial Supply, Inc. ("Charter").

According to the Verified Complaint, Espinoza began working for Mesa in California as a "Quality Control/Design Drafter" in 2012. (Compl., Doc. 1, #6). In that position, he maintained and updated drawings for manufactured equipment, among other duties. (*Id.*). Espinoza transferred to Mesa's Cincinnati location in 2016 and continued working there until his resignation in January 2020. (*Id.* at #9). Defendant Kyle King worked for Mesa in Cincinnati from 2016 to 2018. (*Id.* at #10).

In 2012, at the outset of his employment, Espinoza signed a Non-Compete and Non-Disclosure Agreement ("NC/ND"). (*Id.* at #6). Under that agreement, Espinoza agreed "not to give, divulge, offer or promise" Mesa's "Trade Secrets [or] Propriety Information" to any other "company, organization or institution." (*Id.* at #6–7). That prohibition applied to categories of information including "formulas, processes, materials specifications and designs (current and prototype), pricing information, customer lists, supplier/sub-contractor vendor list[s], [and] business plans." (*Id.*).

Both Espinoza and King also executed "Employee Handbook Acknowledgment forms," by which they acknowledged the Non-Disclosure Policy included in Mesa's Employee Handbook. (*Id.* at #7, 10). That policy notified employees that they "may have access to … information of a confidential, proprietary, or secret nature," including "devices, inventions, processes and compilations of information, records, specifications, and information concerning customers or vendors." (*Id.* at #7). It also warned employees against disclosing or using "any of the above-mentioned trade

2

secrets … *either during the term of their employment or at any time thereafter*," unless required in the course of their employment with Mesa. (*Id.* (emphasis added)).

Separately, Espinoza also signed in 2013 a Nondisclosure Agreement ("NDA") with an Ohio choice of law provision. (*Id.* at #7, 9). In doing so, Espinoza similarly agreed to protect Mesa's "Confidential Information" from "disclosure to any person other than to persons having a need for disclosure in connection with [Espinoza's] authorized use of the Confidential Information," as well as to prevent it from becoming public or falling into the hands of "unauthorized persons." (*Id.* at #8).

That NDA defined "Confidential Information" broadly to include, among other things, information about Mesa's customers and potential customers, as well as Mesa's "trade secrets, technologies, engineering or operation methods or techniques, research data, formulas, … marketing plans, service plans, … names of customers or potential customers, customer files, vendor lists, vendor files, [and] contracts …." (*Id.* at #7–8). Indeed, that agreement provided that "*all information* disclosed" by Mesa during Espinoza's employment was to be deemed the "confidential and proprietary information of [Mesa], irrespective of the source or true ownership of such information." (*Id.* at #8 (emphasis added)). In paragraph 6 of the NDA, Espinoza agreed to return or destroy any of Mesa's Confidential Information within 15 days of his termination. (*Id.* at #8–9).

Mesa alleges that these measures were necessary because, in the course of his employment, Espinoza accessed and used Mesa's trade secrets. (*See id.* at #9, 10 (noting that Espinoza and King were "provided access to valuable confidential …

3

information, including … the AST Database, [and] Application Drawings")). Mesa identifies two categories of information as "trade secrets." First, Mesa maintains an Above-Ground Storage Tank Database ("AST Database") which has "detailed information about its customers' tanks, their components, technical specifications, service history, pricing and other information." (*Id.* at #5). The AST Database is a compilation of thirty years of data, which Mesa says is not publicly available and could not be replicated without substantial time and effort. (*Id.*). Second, Mesa maintains "Application Drawings" regarding each tank in the AST Database. (*Id.*). Application Drawings "provide additional critical information regarding the use of specific products in specific tanks and allow for efficient servicing of tanks without the need to re-engineer products." (*Id.*). These drawings give Mesa a competitive advantage because having advance knowledge of a tank's specifications and past service allows it to anticipate customers' needs, prepare parts and components in advance, and eliminate or minimize engineering issues. (*Id.* at #6).

Mesa says it relies on its AST Database and Application Drawings, among other confidential information, to compete for business. It also says it has tried to maintain the confidentiality of this information, including through the ND/NC and NDA agreements outlined above. In addition, the Database and Drawings "are not publicly available and are maintained by [Mesa] in confidentiality, with limited access granted only to employees who have a job related need to access the AST Database and/or Application Drawings." (*Id.* at #5).

In 2020, Mesa learned that Espinoza, despite telling Mesa he was accepting another position in Cincinnati, had gone to work with Charter in California. (*See id.* at #9). Mesa sent a letter to Espinoza, copying Charter, reminding Espinoza of his legal obligations regarding Mesa's confidential information and trade secrets. (*Id.*). Espinoza responded that he had not "used and [would] not use any of Mesa's confidential or trade secret information in any manner including in [his] employment with Charter." (*Id.* at #10).

According to Mesa, however, that assurance was false; Espinoza was, in fact, using Mesa's confidential information. (*Id.*). In January 2022, William Dominguez, another former Mesa employee who had left Mesa to work for Charter (but is not a party to this action), contacted Mesa about potential use of Mesa's trade secrets by Defendants. (*Id.* at #12). According to Dominguez, Espinoza had copied Mesa's AST Database and Application Drawings on a USB thumb drive, which he then shared with King and Charter. (*Id.*). Dominguez also sent what he claims are screenshots of texts between Espinoza, King, and others at Charter in which they reference specific tanks owned by Mesa customers and identify storage tanks by the numbers that Mesa assigned to those ASTs in Mesa's AST Database. (*Id.*; *see also* Text Message Screenshots, Compl. Ex. C, Doc. 1-3). The messages allegedly include pictures of Mesa Application Drawings and other materials, such as Mesa's chemical compatibility chart. (Compl., Doc. 1, #12–13).

Mesa filed a verified, eight-count Complaint on March 29, 2022. In that Complaint, Mesa asserts claims for: breach of contract and breach of the duty of

loyalty against Espinoza, tortious interference with contract against Charter, and trade secret misappropriation under both federal and Ohio law against all Defendants. The same day, Mesa filed a Motion for a Temporary Restraining Order and/or Preliminary Injunction (Doc. 2). The Court granted that motion in part on April 7, 2022. (*See* Doc. 13).

In its Opinion and Order granting Mesa's request for a Temporary Restraining Order, the Court observed that the Defendants had "raised concerns" regarding the Court's exercise of personal jurisdiction over them. (*Id.* at #104). Nevertheless, the Court made a preliminary finding, based only on the allegations in Mesa's Verified Complaint (Doc. 1), that it could properly exercise personal jurisdiction over the Defendants, at least for the purpose of a TRO. (*Id.* at #105–06). The Court "specifically note[d]," however, that this "preliminary" conclusion "in no way prejudice[d]" the Defendants' ability to more formally raise the issue going forward. (Id. at #106).

The Defendants have now done so. In fact, less than a week after the Court issued its Order granting Mesa's request for a TRO, Defendants filed the instant Motion to Dismiss or, in the Alternative, Transfer Venue (Doc. 16). Following an agreed abbreviated briefing schedule, Mesa responded in opposition a week later (*see* Doc. 18), and, five days after that, Defendants replied in support (*see* Doc. 20).

At a telephonic discovery conference held after briefing on the matter was complete, Mesa suggested that it had recently obtained new evidence that could affect the Court's jurisdictional analysis. Specifically, Mesa had received via subpoena text messages between Dominguez (while he was employed by Charter) and Espinoza

(while he was employed by Mesa in Cincinnati) that appear to show the former soliciting the latter for Mesa drawings and information. Thus, the Court requested additional briefing, which the parties completed on June 21, 2022. (*See* 06/09/2022 Min. Entry; Doc. 23; Doc. 24). The matter is now before the Court.

## LEGAL STANDARD

Because Defendants' Motion presses three arguments—lack of personal jurisdiction, transfer of venue, and failure to state a claim—three different legal standards are involved.

First, faced with a motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), a court has three options: it may (1) "determine the motion on the basis of affidavits alone"; (2) "permit discovery in aid of the motion"; or (3) "conduct an evidentiary hearing on the merits of the motion." *Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 505 (6th Cir. 2020) (quoting *Serras v. First Tenn. Bank Nat. Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989)). If the court decides the motion on the pleadings and affidavits alone, a plaintiff need only make a prima facie showing of personal jurisdiction. *Id.* (quoting *Schneider v. Hardesty*, 669 F.3d 693, 697 (6th Cir. 2012)). In evaluating whether the plaintiff has met this "relatively slight" burden, the court "must consider the pleadings and affidavits in the light most favorable to the plaintiff." *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1169 (6th Cir. 1988) (quoting *Welsh v. Gibbs*, 631 F.2d 436, 439 (6th Cir. 1980)). And the court "does not weigh the controverting assertions of the party seeking dismissal," so as to "prevent non-resident defendants from regularly avoiding personal jurisdiction

simply by filing an affidavit denying all jurisdictional facts." *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991) (citing *Serras*, 875 F.2d at 1214).

Here, the Court is deciding the motion without conducting an evidentiary hearing or permitting jurisdictional discovery—the parties requested neither—and therefore considers the pleadings and affidavits in a light most favorable to Mesa. Thus, if the parties aver conflicting accounts of the salient facts, the Court resolves those conflicts in Mesa's favor. With that in mind, "[d]ismissal … is proper only if *all* the specific facts which the plaintiff ... alleges collectively fail to state a *prima facie* case for jurisdiction." *Kerry Steel, Inc. v. Paragon Indus.*, 106 F.3d 147, 149 (6th Cir. 1997) (quoting *Theunissen*, 935 F.2d at 1458).

Alternative to their personal jurisdiction argument, Defendants ask the Court to transfer this action to the Central District of California under 28 U.S.C. § 1404(a). (Mot., Doc. 16, #133–34). Section 1404(a) provides that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

Deciding whether transfer under § 1404 is appropriate involves a two-step inquiry. First, as the statutory text suggests, the Court must determine if the action "might have been brought" in the transferee court. *See Sky Tech. Partners, LLC v. Midwest Rsch. Inst.*, 125 F. Supp. 2d 286, 291 (S.D. Ohio 2000). Second, the Court must decide whether the circumstances "weigh heavily in favor of the transfer." *Kuvedina, LLC v. Cognizant Tech. Sols.*, 946 F. Supp. 2d 749, 761 (S.D. Ohio 2013) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 645–46 (1964)). The second step is met

where transfer would "prevent wastes of time, energy and money, as well as ... protect the litigants, witnesses and the public against unnecessary inconvenience and expense." *Zimmer Enters., Inc. v. Atlandia Imps., Inc.*, 478 F. Supp. 2d 983, 990 (S.D. Ohio 2007) (citing *Van Dusen*, 376 U.S. at 642).

The party seeking transfer under § 1404(a) bears the burden of showing that the relevant factors weigh "strongly in favor of" transfer. *Boyajyan v. Columbus Fin. Grp., Inc.*, 2007 WL 4410242, at *1 (S.D. Ohio Dec. 13, 2007). That is because, as a general matter, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Reese v. CNH Am. LLC*, 574 F.3d 315, 320 (6th Cir. 2009). Ultimately, the district court has "broad discretion to grant or deny a motion to transfer." *Phelps v. McClellan*, 30 F.3d 658, 663 (6th Cir. 1994).

Finally, Defendants assert that portions of Mesa's Complaint should be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. A plaintiff must "state[] a claim for relief that is plausible, when measured against the elements" of a claim. *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)). "To survive a motion to dismiss, in other words, [the plaintiff] must make sufficient factual allegations that, taken as true, raise the likelihood of a legal claim that is more than possible, but indeed plausible." *Id.*

As with the 12(b)(2) motion, a court considering a motion to dismiss under Rule 12(b)(6) must "construe the complaint in the light most favorable to the plaintiff,

accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (internal quotation omitted). That is true, however, only as to factual allegations. The court need not accept as true Plaintiff's asserted legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Moreover, the well-pled facts must be sufficient to "raise a right to relief above the speculative level," such that the asserted claim is "plausible on its face." *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678. Under the *Twombly/Iqbal* plausibility standard, courts play an important gatekeeper role, ensuring that claims meet a plausibility threshold before defendants face the potential rigors (and costs) of the discovery process. "Discovery, after all, is not designed as a method by which a plaintiff discovers whether he has a claim, but rather a process for discovering evidence to substantiate plausibly-stated claims." *Green v. Mason*, 504 F. Supp. 3d 813, 827 (S.D. Ohio 2020).

## LAW AND ANALYSIS

The Defendants' Motion to dismiss rests on three separate grounds. First and foremost, Defendants argue that this Court lacks personal jurisdiction over them, and that it should therefore dismiss the action under Federal Rule of Civil Procedure 12(b)(2). (Mot. to Dismiss ("Mot."), Doc. 16, #121). Second, Defendants argue that the Court should transfer this action to the Central District of California pursuant to 28 U.S.C.§ 1404(a). (*Id.* at #122). Third, Defendants argue that, even if the Court denies Defendants' motion to dismiss and their alternative motion to transfer, the Court

should nevertheless dismiss Mesa's Breach of the Duty of Loyalty claim against Espinoza (Count Three) and Tortious Interference with Contractual Relationship claim against Charter (Count Four) because these claims are "displaced" by Mesa's Ohio trade secret misappropriation claims (Counts Seven and Eight). (*Id.*).

The Court starts with the jurisdictional issue. That is because, as a general matter, if a court lacks personal jurisdiction over a party, the court is "powerless to take further action" against that party. *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1214 n.6 (11th Cir. 1999) (per curiam) (citing *Read v. Ulmer*, 308 F.2d 915, 917 (5th Cir. 1962)); *see also Alcoa, Inc. v. Delta (Springbok)*, No. 3:07-CV-274, 2008 WL 11449394, at \*6 (S.D. Ohio Oct. 9, 2008), *adhered to on reconsideration*, No. 3:07-CV-274, 2009 WL 983048 (S.D. Ohio Apr. 13, 2009). The Court will then turn to Charter's request to transfer venue, another topic that precedes the merits. *See Wyrough & Loser, Inc. v. Pelmor Labs., Inc.*, 376 F.2d 543, 547 (3d Cir. 1967) ("[P]reliminary matters such … personal jurisdiction and venue should be raised and disposed of before the court considers the merits or quasi-merits of a controversy.").

## A. The Court May Exercise Specific Personal Jurisdiction Over Charter, Espinoza, And King Consistent With Due Process.

Personal jurisdiction comes in two flavors: general and specific. A federal court located in a given state may exercise "general jurisdiction" over a non-resident defendant whose contacts with the forum state are so "'continuous and systematic' as to render [the defendant] essentially at home" there. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945)). "Specific jurisdiction," on the other hand,

applies when a defendant's contacts with the forum state are fewer or less intimate, but where the legal action "arise[s] out of or relate[s] to" those contacts. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021) (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 137 S. Ct. 1773, 1780 (2017)).

Here, Mesa briefly argues that Charter (although not the individual defendants) may be subject to *general* personal jurisdiction in Ohio because of the "many partnerships with Ohio-based corporations" Charter advertises on its website. (Opp'n, Doc. 18, #178). The Court is not persuaded. The Supreme Court requires substantial connections with the forum state to establish general personal jurisdiction; indeed, it has explained that, for a corporation, general personal jurisdiction will typically be found only with respect to the corporation's "place of incorporation and principal place of business." *Daimler AG v. Bauman*, 571 U.S. 117, 137–38 (2014). Charter is not incorporated in Ohio, nor does it maintain its principal place of business here.

To be sure, Charter concedes that general jurisdiction is not limited to only these two "paradigmatic" locations; however, neither does general jurisdiction extend to all states where a "corporation's in-forum contacts can be said to be in some sense 'continuous and systematic.'" *Id.* at 138–39. And even inferring from the Complaint that Charter in fact conducts frequent business with Ohio-based companies, that does not push Mesa's showing across the line. (*See* Compl., Doc. 1, #3 ("Charter regularly conducts business in Ohio and advertises partnerships with Ohio based corporations ….")). A review of the facts in *Daimler* shows why. There, the Supreme Court found

12

general personal jurisdiction in California lacking even where Diamler's subsidiary (whose contacts the Court attributed, arguendo, to Diamler) had three California-based facilities, was "the largest supplier of luxury vehicles to the California market," and accounted for "2.4% of Daimler's worldwide sales." *Daimler*, 571 U.S. at 123. The contacts Mesa alleges here are even less specific and substantial, consisting largely of Charter's advertisement of its relationships with Ohio-based companies. (*See* Opp'n, Doc. 18, #178). That is not enough to make Charter "essentially at home" in Ohio. Accordingly, the Court concludes that it lacks general personal jurisdiction over Charter, and the Court will instead focus its analysis on whether it may properly exercise specific personal jurisdiction over Charter, as well as the individual Defendants.

The Court has subject matter jurisdiction over this action based on federal question jurisdiction as to the Defend Trade Secrets Act claims, *see* 28 U.S.C. § 1331, combined with supplemental jurisdiction over state-law claims, *see* 28 U.S.C. § 1367, the latter including Mesa's breach of contract, breach of the duty of loyalty, tortious interference, and Ohio Uniform Trade Secrets Act claims (*see* Compl., Doc. 1, #13–17, 21–25). Where, as here, the Court's subject-matter jurisdiction is based on a federal question, the exercise of personal jurisdiction over a defendant is proper if it is "both authorized by the forum State's long-arm statute and in accordance with the Due Process Clause of the Fourteenth Amendment." *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 549 (6th Cir. 2016) (citing *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002),

in turn quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 954 F.2d 1174, 1176 (6th Cir. 1992)).

Accordingly, the Court would typically begin its jurisdictional analysis by considering the requirements of Ohio's long-arm statute, and then turn to the Due Process Clause. But the former step is unnecessary here, as Defendants explicitly decline to address whether the exercise of personal jurisdiction is consistent with Ohio's long-arm statute. Instead, Defendants argue only that this Court's exercise of personal jurisdiction would violate the Due Process Clause. (Mot., Doc. 16, #126 n.1). Thus, Defendants have waived any argument regarding application of Ohio's long-arm statute.[1] (*See also* Opp'n, Doc. 18, #175 n.2).

Given Defendants' failure to contest application of Ohio's long-arm statute, Mesa need show only that the Court's exercise of specific jurisdiction over the Defendants comports with due process. "When determining whether a district court's exercise of personal jurisdiction would offend due process, '[t]he relevant inquiry is whether … the non-resident defendant possesses such minimum contacts with the forum state that the exercise of jurisdiction would comport with traditional notions of fair play and substantial justice.'" *Beydoun v. Wataniya Rests. Holding, Q.S.C.*, 768 F.3d 499, 505 (6th Cir. 2014) (quoting *Theunissen*, 935 F.2d at 1459).

---

[1] Moreover, even had Defendants not waived the issue, there is considerable evidence that such an analysis is unnecessary in light of recent amendments to Ohio's long-arm statute. *See Chulsky v. Golden Corral Corp.*, __ F.Supp.3d __, No. 1:19-cv-875, 2022 WL 293340, at*5 n.6 (discussing recent addition to Ohio's long-arm statute, which now allows for an exercise of personal jurisdiction on "any basis consistent with the Ohio Constitution and the United States Constitution"). While the Court suspects that the better reading of this new language collapses the formerly two-part personal jurisdiction test into a single Due Process analysis, the Court need not decide the question, given Defendants' waiver of the Ohio long-arm issue.

14

As the Supreme Court recently reiterated, "a strong 'relationship among the defendant, the forum, and the litigation'" is the "'essential foundation' of specific jurisdiction." *Ford Motor Co.*, 141 S. Ct. at 1028 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). For its part, the Sixth Circuit has distilled a three-pronged test to guide the due process inquiry:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968). The Court will first consider each these prongs as they apply to the corporate Defendant, Charter, and then turn to the individual Defendants.

### 1.    The Defendants Have Purposefully Availed Themselves Of Ohio.

The first prong of the *Southern Machine* test—purposeful availment—is the "*sine qua non* for *in personam* jurisdiction." *Id.* at 381–82. It asks whether the defendant has "purposefully avail[ed] himself of the privilege of acting" or "causing a consequence in the forum state," *id.* at 381, thereby "invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). This requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" *Id.* (internal citations omitted). Importantly, "physical presence in a forum state is not required, and the Supreme Court has 'consistently rejected the

15

notion that an absence of physical contacts can defeat personal jurisdiction there.'" *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 551 (6th Cir. 2007) (quoting *Burger King*, 471 U.S. at 476). As noted, for purpose of this analysis, the Court considers Charter and the individual Defendants separately.

### a.    Charter Has Purposefully Availed Itself Of Ohio.

Start with Charter. Mesa alleges that Charter "hired a number of Mesa's employees … with the specific intent to obtain confidential information and unfairly compete with Mesa." (Opp'n., Doc. 18, #180; *see also* Compl., Doc. 1, #11). Mesa argues that, in doing so, Charter subjected itself to specific personal jurisdiction in this Court because Charter's "tortious conduct was purposefully directed at an Ohio-based company, and thus at this forum." (Opp'n, Doc. 18, #180). Mesa also alleges that, "[u]pon information and belief, Defendant Espinoza provided drawings and assistance to Defendant Charter while he was still employed" by Mesa, presumably in Ohio. (Compl., Doc. 1, #10). In the course of supplemental briefing on the motion to dismiss, Mesa submitted a series of text messages in support of this allegation. Consistent with the allegation, these texts appear to show Dominguez, at the time a Charter employee, and Espinoza, at the time a Mesa employee in Cincinnati, arranging for Espinoza to provide product drawings from Mesa for Charter customers. (*See generally* Robinson Decl., Doc. 23-1).

Before considering the substance of these texts, however, the Court must address a preliminary matter—can the Court consider the texts at all? Defendants argue that the Court may not. In support of that, Defendants note that Mesa's counsel

16

offered the texts through his own declaration, and they argue that, because he lacks personal knowledge of the exchanges, he is incompetent to authenticate the texts. (Def. Sur-Reply in Supp., Doc. 24, #399–400).

In fairness to Defendants, numerous courts have suggested that the Rule 56 summary-judgment standard applies when a party raises evidentiary issues under Rule 12(b)(2). *Consumer Crusade, Inc. v. JD&T Enters., Inc.*, No. 05CV00211EWN-MJW, 2006 WL 1748995, at *3 (D. Colo. June 22, 2006) (citing *FDIC v. Oaklawn Apts.*, 959 F.2d 170, 175 n.6 (10th Cir. 1992)); *Contrak, Inc. v. Paramount Enters. Int'l, Inc.*, 201 F. Supp. 2d 846, 850 (N.D. Ill. 2002) (citing *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1215 (11th Cir. 1999)); *Kemper v. Saline Lectronics*, 348 F. Supp. 2d 897, 899 (N.D. Ohio 2004). Moreover, it is true that Federal Rule of Procedure 56(c) requires that affidavits or declarations "be made on personal knowledge, [and] set out facts that would be admissible in evidence." And, if that standard controls here, it is also true that counsel's declaration says little about the provenance of the screenshots. Counsel avers only that he received the screenshots from Dominguez pursuant to a subpoena, and that the attached screenshots are "true and accurate" copies of what counsel received. (Robinson Decl., Doc. 23-1, #375–76). In other words, while counsel can confirm that these are copies of what he received from Dominguez, counsel cannot testify that they truly and accurately reflect texts that Dominguez and Espinoza exchanged.

According to Defendants, Mesa needed instead to obtain affidavits from Dominguez, Espinoza, or Cho, as parties to the text conversations, stating that the

screenshots are accurate. (*See* Def. Sur-Reply in Supp., Doc. 24, #400 ("Plaintiff's counsel was not a participant to the text messages ….")). That said, the Court notes that all three of these individuals appear on Defendants' lists of potential witnesses (*see* Mot., Doc. 16, #137; Scordato Decl., Doc. 16-1, #146–47); indeed, one (Espinoza) is a party-Defendant. This makes it all the more curious that Defendants stop short of genuinely disputing the authenticity of the text messages themselves. And that is ultimately the problem: Defendants do not argue that the screenshots are not what Mesa's counsel says they are. *See* Fed. R. Evid. 901(a). That matters because, even on motions for summary judgment, "where the objecting party simply argue[s] that the proponent failed to authenticate the documents, as opposed to challenging the authenticity of the documents," courts are often willing to consider the documents, at least if they are documents that appear to be of a type that would be admissible at trial. *Louisville Galleria, LLC v. Philadelphia Indem. Ins. Co.*, No. 3:20-CV-733-CHB, 2022 WL 891628, at *6 (W.D. Ky. Mar. 25, 2022) (citing, among others, *Thomas v. Nat'l Coll. of Va., Inc.*, 901 F. Supp.2d 1022, 1035 (S.D. Ohio 2012)). And that principle should apply, if anything, even more strongly at the dismissal stage, where as a general matter a lower threshold of proof is required. *Cf. Cuhaci v. Kouri Grp., LP*, No. 20-CV-23950, 2020 WL 7698954, at *2 (S.D. Fla. Dec. 28, 2020) (considering extrinsic material on a motion to dismiss because "the Court [could not] find a genuine challenge to the document's authenticity" beyond plaintiff's mere "*ipse dixit* that the proposed exhibit [was] inauthentic" (citing *Todd v. Ocwen Loan Servicing, LLC*, No. 17-CV-60454, 2017 WL 1650622, at *4 (S.D. Fla. May 2, 2017))).

Given such caselaw, the Court is not persuaded by Defendants' technical evidentiary challenge to the text messages. That is particularly true given that Espinoza submitted a supplemental declaration, after Mesa filed the text messages with the Court, conceding that he "entertained a discussion" about making drawings for Cho while he was still at Mesa (the very subject of the purported texts), and in doing so declined to dispute that the text conversations that Mesa filed had, in fact, occurred. (*See* Espinoza Suppl. Decl., Doc. 24-1, #411–12).

Separately, to the extent that Defendants note a fleeting concern about hearsay, (*see* Def. Sur-Reply in Supp., Doc. 24, #400), the Court does not find that an insurmountable hurdle, either. First, Defendants do not argue that the facts contemplated by the text messages "cannot" be submitted in admissible form, but only that, at this stage, they "have not been." *See Harden v. AlliedBarton Sec. Serv.*, No. 3:10–00779, 2013 WL 2467714, at *8 (M.D. Tenn. June 7, 2013) ("The objection now contemplated by [Rule 56] is not that the material 'has not' been submitted in admissible form, but that it 'cannot' be." (internal quotation marks omitted)). As noted, all the alleged text participants are likely witnesses. Moreover, one is a defendant, while another was seemingly acting as an agent of a defendant—meaning texts from them will likely be admissible as party admissions. Fed. R. Evid. 801(d)(2). In any event, "[f]or the purposes of personal jurisdiction, the Court may consider unauthenticated hearsay evidence so long as it bears 'circumstantial indicia of reliability.'" *Reddy v. Adarsh Devs.*, No. EDCV19-406 JGB, 2019 WL 4451235, at *4 (C.D. Cal. July 24, 2019); *see also Akro Corp. v. Luker*, 45 F.3d 1541, 1546–47 (Fed.

Cir. 1995). The texts here, which counsel represent were produced in response to a subpoena, do.

Thus, the Court can, and does, consider the text messages in its jurisdictional inquiry. And those texts paint an interesting picture. In them, Dominguez asks what kind of laptop and software Espinoza would need to create drawings for Cho (a Charter customer), and says "we"—ostensibly Charter—would preinstall an email ("engineering@charterindustrial.com"), so that "no names" would be attached to the work. (Robinson Decl., Doc. 23-1, #380–81). Espinoza assents, saying he would need a laptop capable of running AutoCad Mechanical 2015. (*Id.* at #382). He also asks how they would handle communication if customers had questions; "should [he] use an alias?" (*Id.* at #383–84). Dominguez says that they could get the same laptop Espinoza uses now, and also suggests that they would need to "change the format of the drawings" so they would not "look exactly like Mesa['s drawings]." (*Id.* at #385).

Over a year later, Dominguez texts Espinoza again, saying that a customer needed two hoses "immediately" and asking for specific drawings by reference to "AST" numbers. (*Id.* at #391). That is followed by four drawings (though it is unclear from which party), each appearing to show tank specifications and each bearing an "Mi" logo. (*Id.* at #392–95). Many months later, in early 2020, Dominguez again texts Espinoza asking for an AST drawing. (*Id.* at #396). This time, however, Espinoza responds that Mesa had recently "handed everyone [a] non-compete [and] non-disclosure [agreement]." (*Id.*). Dominguez directs Espinoza not to sign it; instead, he

tells Espinoza to "[r]esign using [the non-compete] as one of [his] excuses." (*Id.* at #397).

The texts also include communications between Dominguez and Ki Yong Cho, the owner of CP International Enterprises, a former Mesa customer that now buys Charter products and exports them to China. (Scordato Decl., Doc. 16-1, #147). The texts between Dominguez and Cho concern the logistics of Espinoza's potential work for Charter. Cho tells Dominguez that Cho spoke to "Dan" (apparently Scordato, founder and principal of Charter), and that Dan approved of paying Espinoza per drawing. (Robinson Decl., Doc. 23-1, #386–89).

Looking at all of Mesa's allegations, the Court concludes that Charter purposefully availed itself of Ohio by acting in and causing a consequence here. *See S. Mach. Co.*, 401 F.2d at 381. In that regard, the Sixth Circuit has suggested that, where the plaintiff alleges tortious activity directed toward a forum resident, the minimum contacts inquiry is guided by the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984). *See Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1119–20 (6th Cir. 1994) (analogizing to *Calder*). *Calder* sets forth the so-called "effects test" for minimum contacts, based on the proposition that a defendant's conduct outside the forum state may suffice to confer personal jurisdiction if the defendant "purposefully directs activities towards the forum state with the intent to cause harm there." *Scotts Co. v. Aventis S.A.*, 145 F. App'x 109, 113 (6th Cir. 2005); *Calder*, 465 U.S. at 790.

The Supreme Court later clarified—and arguably narrowed—the application of *Calder* in another "effects test" case, *Walden v. Fiore*, 571 U.S. 277 (2014). In *Walden*, two Nevada residents sued a Georgia law enforcement officer because he allegedly violated their rights by seizing a large amount of money they had attempted to carry through the Atlanta airport. *Id.* at 279–81. In holding that a Nevada court had no personal jurisdiction over the Georgia officer for acts committed in Georgia, the Supreme Court found that the officer did not have "anything to do with Nevada." *Id.* at 289. His only connection to Nevada was that he knew the plaintiffs were from there, and that they might feel a financial loss there resulting from his seizure of their money. *Id.* at 289–90. Thus, despite his allegedly tortious conduct directed toward the Nevada-resident plaintiffs (when they were present in Georgia), personal jurisdiction in the Nevada courts was improper.

In the wake of *Walden*, then, it appears that a bare allegation that a defendant caused an effect in the forum state, standing alone, does not suffice to confer specific personal jurisdiction. The Sixth Circuit, while declining to precisely delineate *Walden*'s effect on *Calder*, has put it this way: "plaintiffs must do more than claim that [the defendant's] actions affected them in [the forum state] and must show that [the defendant] had some level of contact with the state." *MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894, 901 (6th Cir. 2017). Mesa has done so here.

Taking the allegations and affidavits in a light most favorable to Mesa, the following narrative emerges: Charter, via Dominguez and with the approval of Scordato, reached out to Ohio, solicited work from a Mesa employee working here,

and offered the employee a Charter email address and a laptop. Charter also suggested that the Mesa employee tweak the formatting on various drawings so they wouldn't look "just like Mesa['s]." On at least two other occasions, Charter requested specific "AST" drawings—ostensibly a reference to Mesa's AST database numbers—and on at least one of those occasions received drawings that appear to bear Mesa's logo. When the employee raised a concern about Mesa's nondisclosure agreement, Charter directed the employee not to sign it and told him to instead resign. Charter promptly hired that employee (after having hired several other former Mesa employees), who Mesa alleges to have absconded with a thumb drive containing Mesa's trade secrets. Then, despite knowing of the employee's confidentiality obligations, Charter allegedly continued to deal in and benefit from those trade secrets. This is enough to meet the "relatively slight" burden Mesa must carry to defeat a motion to dismiss under 12(b)(2). *Am. Greetings Corp.*, 839 F.2d at 1169.

Contrary to Charter's argument, the Court's finding of purposeful availment does not rely exclusively on Mesa experiencing harm in Ohio that is divorced from any "express aiming" on Charter's part. (*See* Def. Sur-Reply in Supp., Doc. 24, #401–03). Nor does the finding rest solely only on Dominguez's use of the "interstate facilities," i.e, his use of text messages. (*Id.* at #403–04). Rather, the Court focuses on "[t]he proper question," which "is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a

23

meaningful way." *Walden*, 571 U.S. at 290. Here, the Court answers that question in the affirmative.[2]

Similarly, Charter's reliance on *Gold Medal Products Co. v. Bell Flavors & Fragrances, Inc.*, No. 1:16-CV-00365, 2017 WL 1365798 (S.D. Ohio Apr. 14, 2017), offers it little help. There, the court declined to exercise specific jurisdiction over a non-resident company despite that the plaintiff "felt the effect of [the defendants'] allegedly tortious conduct in Ohio." *Id.* at *6. But the excerpt Defendants cite in their brief is telling:

> Gold Medal does not allege that Bell Flavors traveled to Ohio to recruit, interview, or hire Sunderhaus. It does not allege that Sunderhaus took actions in Ohio as Bell Flavors's agent. More specific to the misappropriation claims, Gold Medal does not allege that Bell Flavors hired Sunderhaus for the purpose of obtaining Gold Medal's trade secret information nor for the purpose of helping Gold Medal's competitors formulate competing food products. … Sunderhaus acquired the trade secret information in Ohio by legitimate means and only is alleged to have taken wrongful acts outside of the forum state more than one year later.

*Id.* at *8. Here, of course, Mesa makes several of the allegations the court found absent in *Gold Medal*. Namely, that Charter reached out to Ohio (albeit not physically), solicited Mesa's employees, caused Espinoza to disclose Mesa drawings while still in Ohio, intentionally hired Mesa employees to obtain Mesa's confidential

---

[2] Charter's remaining arguments essentially amount to selective interpretations of what the texts may or may not mean. (*See, e.g.*, Def. Sur-Reply in Supp., Doc. 24, #404 ("Contrary to Plaintiff's argument, it is equally plausible that Dominguez … could have sent those images to Espinoza …."); *id.* at #405 (arguing that the texts evince only "plans to engage in conduct" rather than conduct itself)). In that regard, the Court is bound to take the texts in a light most favorable to Mesa, *see Am. Greetings Corp.*, 839 F.2d at 1169 (quoting *Welsh*, 631 F.2d at 439), which it has done.

information, and knowingly used that information to its benefit. In doing so, Charter purposefully availed itself of Ohio.

### b. Espinoza And King Have Purposefully Availed Themselves Of Ohio.

Moving to the individual Defendants, Defendants assert that "Neither Espinoza Nor King Have Any Contacts With Ohio." (Mot., Doc. 16, #130). This, though, is obviously not true. To the contrary, Espinoza's and King's contacts with Ohio are both quantitatively and qualitatively stronger than Charter's.

Mesa employed both individual Defendants in Ohio for several years. Espinoza lived and worked in Ohio for just over three years, and King did so for two years. During their employments, each Defendant received access to the allegedly confidential information at issue, and each acknowledged their obligations to maintain the confidentiality of such information (through the "Employee Handbook Acknowledgment form"). While in Ohio, Espinoza allegedly communicated with a Mesa competitor and, taking the text messages in a light most favorable to Mesa, apparently sent at least four Mesa drawings to Charter at Dominguez's request. Moreover, even before Espinoza moved to Ohio, Espinoza executed a nondisclosure agreement with Mesa that contained an Ohio choice of law provision. Although not dispositive, that fact points toward a finding of personal jurisdiction. *See Baker v. Bensalz Prods., Inc.*, 480 F. Supp. 3d 792 (S.D. Ohio 2020) ("The Sixth Circuit has … treated choice-of-law provisions as a relevant factor to consider, but not as dispositive."). And after both individual Defendants left Ohio, they allegedly shared with Charter what they knew or should have known to be Mesa's confidential

information. (Compl., Doc. 1, #12). Suffice to say that this is not a case where a non-resident engages in a one-off contract or other fortuitous contact with a party who merely "happens" to reside in Ohio.

Perhaps recognizing the strength of these contacts, the individual Defendants' dispute as to the existence of their contacts elides into a dispute about the timing of those contacts. In particular, they insist that the purposeful availment analysis must be undertaken at the time of the "alleged wrongdoing." (Mot., Doc. 16, #130 (quoting *Stolle Mach. Co., LLC v. RAM Precision Indus.*, No. 3:10-CV-155, 2011 WL 6293323, at *4 (S.D. Ohio Dec. 15, 2011))). And, in Defendants' view, the wrongdoing here occurred *after* Espinoza and King had left Mesa (and Ohio), which means that their contacts with Ohio cannot demonstrate purposeful availment.

But the very case Defendants cite for this proposition, *Stolle Machinery Co., LLC v. RAM Precision Industries*, belies their argument. In *Stolle*, the defendant lived and worked for the plaintiff in Ohio for ten years before relocating to China. 2011 WL 6293323, at *1. The plaintiff alleged that, before leaving, the defendant copied numerous trade secrets and confidential information, which he then utilized—in China—to start a competing company and to solicit the plaintiff's customers. *Id.* The district court found purposeful availment notwithstanding the defendant's departure from Ohio. In doing so, it rejected an argument much like the one Defendants now raise:

> In arguing that purposeful availment is lacking, An focuses almost exclusively on his lack of contacts with Ohio *in the present day*, asserting that, having moved to China, he no longer maintains any personal residence, bank account, or business relationships in the state.

> However, it is axiomatic that, in assessing a defendant's relationship with a given forum, the Court must evaluate the defendant's contacts at the time of the alleged wrongdoing. *Steel v. United States*, 813 F.2d 1545, 1549 (9th Cir. 1987) ("[C]ourts must examine the defendant's contacts with the forum at the time of the events underlying the dispute."). Otherwise, a defendant could "defeat personal jurisdiction by a move away from the state in which the underlying events took place." *Id.* Accordingly, the fact that An now lives in China, rather than Ohio, is irrelevant to the purposeful availment issue.

*Id.* at *4 (emphasis added).[3]

Thus, the Court "examin[es] the defendant's contacts with the forum at the time of the events underlying the dispute." *Steel*, 813 F.2d at 1549. Here, the "events underlying the dispute" include a years-long employment relationship based in Ohio, acknowledgment of receipt of confidential information in the State, and, at least as to Espinoza, an NDA with an Ohio choice of law provision, among other things. The Due Process Clause merely "require[s] that individuals have 'fair warning that a particular activity may subject [them] to … jurisdiction.'" *Burger King*, 471 U.S. at 472 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977)). In this case, the fair warning given to Espinoza and King by their extended sojourns in Ohio "does not expire simply because of [their] lack of later contacts with [Ohio]." *Steel*, 813 F.2d at 1549–50. In sum, the Court has little difficulty concluding that the individual Defendants' conduct amounts to purposeful availment of the forum state.

---

[3] On appeal, the Sixth Circuit affirmed the district court's exercise of personal jurisdiction over the individual defendant and his Chinese entity without fanfare. *See Stolle Mach. Co., LLC v. RAM Precision Indus.*, 605 F. App'x 473, 481 (6th Cir. 2015) ("[W]e conclude that the district court's exercise of jurisdiction over An and SLAC comported with due process.").

### 2. Mesa's Claims "Arise From" The Defendants' Contacts With Ohio.

The second prong of the *Southern Machine* test asks whether the cause of action asserted "arise[s] from the defendant's activities" in the forum state. *Southern Machine*, 401 F.2d at 381. However, the Sixth Circuit has articulated the standard "in a number of different ways, such as whether the causes of action were 'made possible by' or 'lie in the wake of' the defendant's contacts, or whether the causes of action are 'related to' or 'connected with'" those contacts. *Air Prods.*, 503 F.3d at 553 (citations omitted). Whatever the formulation, this "arising from" test is a "lenient standard." *Id.* (citing *Bird*, 289 F.3d at 875). And the Court concludes that Mesa's claims against all Defendants "arise from" the Defendants' contacts with Ohio.

Starting with Charter, Mesa's misappropriation claims "arise from" Charter's Ohio contacts. As discussed above, Charter aimed its conduct toward Mesa in Ohio, including by allegedly requesting and receiving Mesa drawings, inducing Espinoza to resign, and knowingly using Mesa's allegedly confidential information to service its customers to Mesa's detriment (resulting in harm in Ohio). That suffices under this "lenient standard." *Id.* (citing *Bird*, 289 F.3d at 875); *see also Corp. Bertec v. Sparta Software Corp.*, No. 2:19-CV-04623, 2020 WL 2112162, at *6 (S.D. Ohio May 4, 2020) ("Bertec's claims arise from Playground's Ohio connections because Playground used electronic software obtained from Bertec and allegedly used Bertec's source code to create a prototype that would interfere with Sparta and Bertec's Ohio contract ….").

Moving to Espinoza and King, they likewise contend that their conduct while employed at Mesa "does not form the basis of any of [Mesa's] claims." (Reply, Doc. 20,

#330). That is, they again attempt to limit the Court's temporal focus to only what occurred after they left Ohio. But, again, this is too narrow a view. To be sure, Mesa's misappropriation claim became actionable only when the alleged trade secret information was (allegedly) disclosed. But to sever that final act from all the predicate conduct that made that disclosure possible (i.e., the individual Defendants' employment, receipt of confidential information, and acknowledgment of responsibilities regarding that information) would not fit with this circuit's relatively broad view of "arising from." And, at least as to Espinoza, Mesa alleges that he began disclosing confidential information even before he left Ohio. From that, the Court concludes that Mesa's misappropriation claims were "made possible by," "lie in the wake of," or are "related to" the individual Defendants' contacts with Ohio. *See Air Prods.*, 503 F.3d at 553.

This conclusion is even stronger as to the breach of contract claims against Espinoza. Where a defendant purposefully avails himself of the forum state by reaching out and creating a continuing contractual obligation to a forum-resident plaintiff, a breach of that obligation (the contract) "naturally arises from the defendant's activities" in the state. *Tharo Systems, Inc. v. cab Produkttechnik GmbH & Co. KG*, 196 F. App'x 366, 371 (6th Cir. 2006) (citing *Cole v. Mileti*, 133 F.3d 433, 436 (6th Cir. 1998)); *In-Flight Devices Corp. v. Van Dusen Air, Inc.*, 466 F.2d 220, 229 (6th Cir. 1972) ("Defendant's … entering of a contractual relationship with an Ohio corporation [] is necessarily the very soil from which the action for breach grew. The intimate relationship between the jurisdictional basis and the cause of action …

29

cannot be denied here."). Espinoza signed the underlying NDA in 2016 while employed by Mesa, albeit prior to his relocation to Ohio. In doing so, however, he contracted with a company maintaining its principal place of business in Ohio and agreed that the NDA and any actions arising under it would be "governed by Ohio law." (Compl., Doc. 1, #9). Moreover, he then worked for the company in Ohio for almost four years, all the while subject to his obligations under the NDA. That is enough to show that the breach of contract claims arise from his contacts with this jurisdiction.

Contrary to Espinoza's argument, this Court's decision in *Baker*, 480 F. Supp. 3d 792, does not require a different result. In *Baker*, a number of non-Ohio residents (both individual and corporate) negotiated and executed a non-disclosure agreement with the Ohio plaintiff regarding a potential film project. *Id.* at 796–97. When those non-Ohio defendants allegedly disclosed information about the project, thereby breaching the NDA, the plaintiff sued in this Court. The defendants moved to dismiss the action for a lack of personal jurisdiction, and the Court granted that request, concluding that the plaintiff had failed to establish either the "purposeful availment" or "arising from" prong of the *Southern Machine* test. *Id.* at 803–07. On the "arising from" prong, the plaintiff fell short because "the alleged Ohio-based activities principally related to the very initial steps of contract formation (i.e., the 'targeting' of Plaintiffs in Ohio)," whereas the claims themselves "involv[ed] allegations of later breach." *Id.* at 806. Thus, the breach of contract claim did not "have a substantial

connection with the defendant's in-state activities." *Id.* (quoting *Southern Machine Co.*, 401 F.2d at 384 n.27).

This case is distinguishable. Espinoza's contacts with Ohio are not limited to his initial negotiation and formation of the NDA agreement. Rather, Mesa alleges that it was during Espinoza's four-year employment with Mesa in Ohio that Espinoza was exposed to (at least some of) the trade secrets at issue. Mesa also alleges, based on the text messages, that Espinoza began breaching his agreements while he was still in Ohio. And, although not specifically alleged, the Court may plausibly infer that Espinoza copied Mesa's AST Database and Application Drawings onto the alleged "USB thumb drive" while in Ohio. (*See* Compl., Doc. 1, #12). Thus, the breach of contract claim "arises from" Espinoza's contact with Ohio.[4]

### 3. Exercising Personal Jurisdiction Over The Defendants Is Reasonable.

The Court next turns to the third *Southern Machine* prong. *See LAK, Inc. v. Deer Creek Enters.*, 885 F.2d 1293, 1303 (6th Cir. 1989) ("[E]ach [*Southern Machine*] criterion represents an independent requirement, and failure to meet any one of the three means that personal jurisdiction may not be invoked."). This prong requires that "the acts of the defendant or consequences caused by the defendant must have a

---

[4] In distinguishing the circumstances in *Baker* from those in *Cole v. Mileti*, 133 F.3d 433 (6th Cir. 1998), the Court found it "worth noting" that in *Cole*, "the out-of-state defendant had been an Ohio resident, and business associate of the plaintiff, for many years before moving to California, and the contract at issue involved the out-of-state defendant's purchase of personal property (shares in a company) that the Ohio plaintiff owned." *Baker*, 480 F. Supp. 3d at 804 (citing *Cole*, 133 F.3d at 436). The Court likewise finds it worth noting here that Espinoza was an Ohio resident, and employee of Mesa, for many years before he moved to California, and the contract at issue involves Espinoza's ongoing obligation to maintain the secrecy of Mesa's sensitive competitive information.

substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *S. Mach. Co.*, 401 F.2d at 381. But in making that determination, the Court starts with a presumption. According to the Sixth Circuit, where the first two prongs of the *Southern Machine* inquiry are met, "an inference arises that the third, fairness, is also present; only the unusual case will not meet this third criterion." *First Nat. Bank of Louisville v. J.W. Brewer Tire Co.*, 680 F.2d 1123, 1126 (6th Cir. 1982) (citing *id.* at 384). In the Court's view, this case is not so unusual as to overcome this inference.

The Supreme Court has articulated several factors a court should consider in determining "reasonableness": (1) the burden on the defendant, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the States in furthering fundamental substantive social policies. *Burger King*, 471 U.S. at 477 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)).

As to the first factor, Defendants contend that litigating in Ohio would pose a significant burden. The individual Defendants, in particular, submitted affidavits averring to the disruption traveling to Ohio would create in their personal and professional lives. (*See* Espinoza Decl., Doc. 16-2; King Decl., Doc. 16-3). That potential disruption is mitigated, however, by the realities of modern litigation. Parties now routinely conduct depositions via videoconferencing technology, and

courts likewise utilize such technology for oral arguments, evidentiary hearings, and even mediation discussions. The parties here have already discussed how the California defendants could participate in an evidentiary hearing remotely.

Second, Ohio undoubtedly has an interest in adjudicating this dispute. The plaintiff maintains its principal place of business in, and employs citizens of, Ohio, and the suit alleges violation of Ohio's Uniform Trade Secret Act, as well as breach of an agreement governed by Ohio law. Third, Mesa has an interest in obtaining convenient and effective relief. Although it is likely true that Mesa could reach all the defendants in another forum (California, for example), it nevertheless filed suit here, and persuasively argues that litigating in California would present an inconvenience. The fourth and fifth factors are, on balance, neutral here. Although the suit might have been more efficiently conducted in a forum less susceptible to a jurisdictional dispute, this decision lays that dispute to rest. Finally, the Court is unpersuaded that California "has the most significant interest" in adjudicating the breach of contract claim against Espinoza. (Mot., Doc. 16, #133). Defendants argue this is so because California has a long-standing aversion to restrictive covenants. But the allegations in Mesa's Complaint focus on the "nondisclosure" part of that agreement, and California courts appear to have fewer qualms about enforcing a restrictive covenant where it is necessary to protect a trade secret. *See DePuy Synthes Sales, Inc. v. Stryker Corp.*, No. EDCV181557FMOKKX, 2020 WL 6205702, at *9 (C.D. Cal. Sept. 29, 2020) ("Some California courts have concluded that '[a]ntisolicitation covenants are void as unlawful business restraints except where their enforcement is necessary to protect

trade secrets.'" (quoting *Thompson v. Impaxx, Inc.*, 113 Cal. App. 4th 1425, 1429 (2003))).

Because the Court concludes that it may properly exercise personal jurisdiction over each defendant consistent with due process, the Court **DENIES** the Defendants' Motion to Dismiss on that basis. Thus, the Court will now turn to Defendants' alternative requests, starting with the request to transfer venue to California.

## B. Transfer Of Venue To California Is Not Warranted.

Alternative to their personal jurisdiction argument, Defendants ask the Court to transfer this action to the Central District of California under 28 U.S.C. § 1404(a). Section 1404(a) provides that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

As noted above, deciding whether transfer under § 1404 is appropriate is a two-step inquiry. First, the Court must determine if the action "might have been brought" in the transferee court. *See Sky Tech. Partners, LLC v. Midwest Rsch. Institute*, 125 F. Supp. 2d 286, 291 (S.D. Ohio 2000). Thus, the proposed transferee court must have subject matter jurisdiction and be a proper venue, and the defendant must be amenable to process issuing from the transferee court. *Id*.

Second, the Court must decide whether the circumstances "weigh heavily in favor of the transfer; § 1404(a) is not intended to shift an action to a forum likely to prove equally convenient or inconvenient." *Kuvedina, LLC v. Cognizant Tech. Sols.*, 946 F. Supp. 2d 749, 761 (S.D. Ohio 2013) (citing *Van Dusen v. Barrack*, 376 U.S. 612,

34

645–46 (1964)). The second step is met where transfer would "prevent wastes of time, energy and money, as well as ... protect the litigants, witnesses and the public against unnecessary inconvenience and expense." *Zimmer Enters., Inc. v. Atlandia Imps., Inc.*, 478 F. Supp. 2d 983, 990 (S.D. Ohio 2007) (citing *Van Dusen*, 376 U.S. at 642). In making this determination, the Court may consider:

> (1) the convenience of the parties; (2) the convenience of the witnesses; (3) the relative ease of access to sources of proof; (4) the availability of process to compel attendance of unwilling witnesses; (5) the cost of obtaining willing witnesses; (6) the practical problems associated with trying the case most expeditiously and inexpensively; and (7) the interest of justice.

*Id.* (quoting *Helder v. Hitachi Power Tools, USA Ltd.*, 764 F. Supp. 93, 96 (E.D. Mich. 1991)). Other relevant considerations include the plaintiff's choice of forum, familiarity of the court with applicable law, and the possibility of prejudice in either forum. *See Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508 (1947).

The party seeking transfer under § 1404(a) bears the burden of showing that the relevant factors weigh "strongly in favor of" transfer. *Boyajyan*, 2007 WL 4410242, at *1. Ultimately, the district court has "broad discretion to grant or deny a motion to transfer." *Phelps,* 30 F.3d at 663.

### 1. The Action Might Have Been Brought In The Central District Of California.

An action "might have been brought" in a transferee court if that court has subject matter jurisdiction over the action, venue is proper there, and the defendant is amenable to process issuing out of the transferee court. *Sky Tech. Partners*, 125 F.

Supp. 2d at 291. Of those requirements, Mesa contests only the second: whether venue would be proper in the Central District of California. (Opp'n, Doc. 18, #183).

"A civil action may be brought in," among other places, "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391. A "substantial part" means "any forum with a substantial connection to the plaintiff's claim." *First of Mich. Corp. v. Bramlet*, 141 F.3d 260, 263 (6th Cir. 1998). Mesa contends that venue would not be proper in California because "it is not clear" whether "a substantial part of the events" giving rise to its claims occurred there, and that Charter's suggestion otherwise is "conclusory." (Opp'n, Doc. 18, #183). Reference to Mesa's Complaint, however, makes clear that a substantial part of the events giving rise to Mesa's claims at least plausibly occurred in California.

For example, Mesa alleges that Espinoza worked for Mesa in California from 2012 to 2016, and that California is where he executed both the 2012 Non-Compete/Non-Disclosure Agreement and the 2013 Nondisclosure Agreement, both of which Mesa seek to enforce in this action. Mesa also alleges that Espinoza absconded to California in 2020 with his copy of the AST database, and that Espinoza and King disclosed trade secret information to Charter while in California. Thus, at least some of the conduct that allegedly breaches Espinoza's confidentiality agreements—and that constitutes trade secret misappropriation—occurred in California after he left Cincinnati. These events strike the Court as underlying a "substantial part" of the claims here.

### 2. The Balance Of Convenience And The Interests Of Justice Do Not Strongly Favor Transfer.

But while the action could have been brought in the Central District of California, Defendants have not met their burden at the second step. That is, Defendants have not shown that the circumstances weigh "strongly in favor" of transferring the action now that it has already been brought in this Court. *See Boyajyan*, 2007 WL 4410242, at *1 (party seeking transfer bears the burden of showing that the relevant factors weigh "strongly in favor of" transfer).

As noted above, the public and private interests relevant to the transfer analysis are myriad. Here, though, the parties focus on five: the relative docket congestion of each court, the familiarity of the court with controlling law, convenience of the witnesses, locations of the evidence, and the convenience and preference of the parties (including the plaintiff's choice of forum). The Court will consider each in turn.

First, Defendants note that the proposed transferee court appears at first glance to dispose of cases more expeditiously than does this Court. That is, with respect to civil actions, the Central District of California reports a median time of 4.7 months from filing to disposition, compared to 10.4 months in the Southern District of Ohio. U.S. District Courts–Median Time Intervals From Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending September 30, 2021, at 3, 5 (Sept. 30, 2021) (hereinafter "District Court Disposition Statistics").[5] But, as Mesa points out, that disparity begins to

---

[5] Available at https://www.uscourts.gov/sites/default/files/data_tables/jb_c5_0930.2021.pdf.

disappear when one removes from the data set cases resolved with "no court action." (*See* Opp'n, Doc. 18, #186 ("[T]he Central District of California may receive a good deal of frivolous cases which are quickly dispensed with …."")). When comparing statistics for cases resolved "during or after pretrial" or "during trial," categories to which this case is more likely to belong, the disparity narrows to 3.2 months and 0.2 months, respectively. District Court Disposition Statistics at 3, 5. In the realm of complex civil litigation, the Court does not consider a three-month extension of the time to resolution as onerous. Thus, while it is true that "[t]his Court has previously … evaluate[d] docket congestion for purposes of deciding whether to transfer a case," *Worthington Indus., Inc. v. Inland Kenworth (US), Inc.*, No. 2:19-CV-3348, 2020 WL 1309053, at *18 (S.D. Ohio Mar. 18, 2020), the Court concludes that this factor weighs only slightly in favor of transfer, if at all.

Second, Defendants argue that this Court has less interest in adjudicating the case because sources of applicable law are primarily federal, rather than state, law. Even accepting that notion as true, though, it would seem to apply equally to the Central District of California—after all, this case does not raise any novel or important issues of California law. To the contrary, although this case does involve federal trade secret law, it also invokes Ohio's Uniform Trade Secret Act, as well as breach of a contract with an Ohio choice of law provision. Though the Court has no doubt that a California District Court could ably apply Ohio statutory and common law, that ability merely does not militate *against* a transfer; it does nothing to tip the scales in favor of one. *Cf. Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*,

571 U.S. 49, 64 (2013) ("Because [public interest factors] will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases.").

Third, Defendants point to the geographical distribution of likely witnesses and argue that many, "including some non-parties, would be inconvenienced by having to travel to Ohio for trial." (Mot., Doc. 16, #137). Several of Defendants' proposed witnesses, of course, are parties, including Espinoza and King. Their convenience is of only limited concern to the Court. Likewise, potential witnesses who are Charter employees and principals (that Charter says are spread between Oklahoma and California) merit little consideration. "[W]hen a party's out-of-state witnesses are its own employees, the inconvenience is greatly reduced because the party should have no difficulty compelling the employees' presence at trial." *J4 Promotions, Inc. v. Splash Dogs, LLC*, No. 08 CV 977, 2009 U.S. Dist. LEXIS 11023, at *71 (N.D. Ohio Feb. 13, 2009). To be fair, though, this proposition applies to Mesa, as well. That is, even if Mesa's witnesses would be inconvenienced by a transfer to California, it appears most of those witnesses are employees. (*See* Nymburg Decl., Doc. 18-1, #191 ("[W]itnesses Mesa is likely to call in this case, including witnesses to the creation and maintenance of [Mesa's alleged trade secret materials], are located inside of Ohio.")).

That said, Defendants do point to a number of non-party, non-employee witnesses who would likely be inconvenienced if travel to Ohio becomes necessary. (*See* Mot., Doc. 16, #137 (naming Dominguez (California), Carl Robinson (Kentucky),

and "Customers who support Defendants' case")). On that point, though, the Court reiterates that parties now routinely conduct depositions remotely via videoconferencing technology, and courts use the same technology for oral arguments, evidentiary hearings, and even mediation discussions. In all, the Court considers the convenience of the witnesses to weigh only slightly in favor of transfer.

Fourth, the parties raise "ease of access to evidence." (*See* Mot., Doc. 16, #137; Opp'n, Doc. 18, #185). However, the parties agree that this factor is neutral, and the Court concurs: "[t]he location of documents and sources of proof have become a less significant factor in the § 1404(a) transfer analysis because of technological advances and availability of documents in electronic form." *Flagstar Bank, FSB v. Gulfstream Bus. Bank, Inc.*, No. 2:13-cv-12136, 2013 WL 6017977, at *5 (S.D. Ohio Nov. 13, 2013)

Fifth, and finally, Defendants argue that Mesa's choice of forum should not be given serious weight because the balance of the "[p]arties' convenience and preferences" favors transfer. (Mot., Doc. 16, #137). Defendants offer several points in support of this argument, including that Mesa is incorporated in California, that Mesa still conducts at least some business there, and that the claims in the Complaint have a "significant connection" to California. (*Id.* at #137–38).

It is not clear to the Court, however, that Mesa should be divested of its choice of forum just because it is incorporated somewhere else, and Defendants cite no authority to support that argument. Rather, "[t]he plaintiff's choice of forum is to be given considerable weight" and typically should not be disturbed. *Jamhour v. Scottsdale Ins. Co.*, 211 F. Supp. 2d 941, 946–47 (S.D. Ohio 2002). While it is true

40

that the plaintiff's choice merits less weight "[w]hen the cause of action has little connection with the chosen forum," *Armco, Inc. v. Reliance Nat. Ins. Co.*, No. C–1–96–1149, 1997 WL 311474, at \*3 (S.D. Ohio Mar. 30, 1997), that is not the case here. Per the Court's discussion of both personal jurisdiction and venue, the causes of action here have a substantial connection to Ohio; the fact that some of these events played out in California does not make California the "presumptively" proper forum, so to speak. As to this factor, the Court concludes that Mesa's choice of forum weighs at least slightly in favor of retaining the action. (And Defendants concede that the factor is, "at best, neutral." (Mot., Doc. 16, #138).)

In sum, balancing the above considerations, the Court finds that the relevant circumstances point at most weakly in favor of transfer. Because Defendants have failed to show that the public and private interests weigh "strongly" in favor of transfer, they have not carried their burden, and the Court accordingly **DENIES** their request.

## C. Mesa's Claims Against Espinoza For Breach Of The Duty Of Loyalty And Against Charter For Tortious Interference Are Displaced By Its State Law Misappropriation Claims.

In its final alternative argument, Charter urges the Court to dismiss Mesa's Breach of Duty of Loyalty claim against Espinoza (Count Three) and its Tortious Interference with Contractual Relationship claim against Charter (Count Four) because these claims are "displaced" or "preempted" by the Ohio Uniform Trade Secrets Act ("OUTSA"). On this front, the Court agrees with Charter.

Section 1333.67 of OUTSA provides that the trade secret misappropriation provisions of OUTSA "displace conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation," except for "[c]ontractual remedies, whether or not based on misappropriation of a trade secret;" "[o]ther civil remedies that are not based on misappropriation of a trade secret;" and "[c]riminal remedies." Ohio Rev. Code § 1333.67. The Sixth Circuit has instructed that, to determine whether particular claims are displaced, a court must determine "whether the claims are no more than a restatement of the same operative facts that formed the basis of the plaintiff's statutory claim for trade secret misappropriation." *Stolle Mach.*, 605 F. App'x at 485 (quoting *Thermodyn Corp. v. 3M Co.*, 593 F.Supp.2d 972, 989 (N.D. Ohio 2008) (internal quotations omitted)); *see also Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925, 940 (S.D. Ohio 2012) ("The relevant question is whether the facts supporting the common law claim are solely dependent on the same operative facts as the UTSA claim." (citing *Allied Erecting & Dismantling Co., Inc. v. Genesis Equip. & Mfg., Inc.*, 649 F.Supp.2d 702, 721 (N.D. Ohio 2009))).

Looking to Counts Three and Four of Mesa's Complaint, the Court concludes that these common law claims merely restate the operative facts of the misappropriation claims. Indeed, Mesa frames Count Three, Breach of the Duty of Loyalty, as Espinoza's violation of his "duty not to engage in the unlawful conduct as described herein in misappropriating, using and/or disclosing [Mesa's] confidential information and trade secrets." (Compl., Doc. 1, #15–16). And Count Four, Tortious

42

Interference with Contractual Relationship, alleges that Charter "was aware of Defendant Espinoza's obligation to retain the confidentiality of [Mesa's] confidential, proprietary, and trade secret information," and that Charter "intentionally … caused Defendant Espinoza to breach" those contractual obligations, the breach of which redounded to Charter's benefit. (*Id.* at #17).

These claims, then, rely on the same facts as do the misappropriation claims. Mesa does not argue otherwise. Instead, Mesa argues that it would be "premature" for the Court to dismiss these common law claims. (Opp'n, Doc. 18, #187–88). That is, in Mesa's view, a claim is preempted by OUTSA only when the OUTSA claim ultimately succeeds on the merits and, until then, a plaintiff may proceed on all claims in the alternative, as it were. (*See id.*). While that interpretation of OUTSA might have certain benefits, the great weight of the case law (including several decisions of this Court) rejects it. *See Cincom Sys., Inc. v. LabWare, Inc.*, No. 1:20-CV-83, 2021 WL 675437, at *5 (S.D. Ohio Feb. 22, 2021) (collecting cases); *Emp. Health Sys., LLC v. Sterling Com. (Am.), LLC*, No. 2:12-CV-611, 2013 WL 12123865, at *6 (S.D. Ohio Sept. 30, 2013) ("[T]he predominant view among courts is that the UTSA preempts not only claims involving trade secrets, but also 'any claim regarding theft or misuse of confidential proprietary, or otherwise secret information falling short of trade secret ….'" (quoting *Office Depot, Inc. v. Impact Off. Prods., LLC*, 821 F. Supp. 2d 912, 919 (S.D. Ohio 2011))).

Mesa makes no attempt to engage with or distinguish these (or any) authorities, and the Court sees no reason to depart from their holdings. Thus, the

Court **GRANTS** Defendants' motion insofar as it **DISMISSES** Counts Three and Four of Mesa's Complaint as preempted by the Ohio Uniform Trade Secrets Act.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion (Doc. 16). Specifically, the Court **DENIES** Defendants' Motion to Dismiss for lack of personal jurisdiction, as well as Defendants' alternative request to transfer the action to the Central District of California. The Court **GRANTS** Defendants' Motion to the extent that it **DISMISSES** Counts Three and Four of Mesa's Complaint (Doc. 1) for failure to state a claim.

**SO ORDERED.**

August 3, 2022
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**